UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ERICK TURNER,

                                    Plaintiff,

            -against-

THE CITY OF NEW YORK, KEVIN
DESORMEAU, AND JOHN AND/OR
JANE DOE POLICE OFFICERS 1-10.

                                    Defendants.

Index No.:   23CV1432

**COMPLAINT**

Jury Trial Demanded

Plaintiff ERICK TURNER, by his attorneys, Glenn A. Garber, PC, complaining of the Defendants, alleges the following, upon personal knowledge and information and belief:

**NATURE OF THE CASE**

1.      This is a civil rights action brought against the City of New York and members of the New York City Police Department ("NYPD"), who violated Plaintiff's rights under the Constitution of the United States and the Constitution of the State of New York.

2.      Although innocent, Plaintiff Erick Turner ("Turner") was framed by police for possessing a loaded firearm on October 20, 2010, in the County of Queens.

3.      As a result of the wrongful conviction, Turner spent 20 months at Riker's Island and another 18 months in New York state prison.

4.      Turner's conviction on the 2010 case was vacated and dismissed on November 8, 2021, by a Justice of the Queens County Supreme Court.  The vacatur occurred at the insistence of the Queens County District Attorney, who determined that then Police Officer Kevin Desormeau, the arresting officer who swore out the complaint in Turner's case and who was an "essential witness in the arrest and prosecution" of Turner, was completely untrustworthy.

1

Indeed, Desormeau was convicted of fabricating evidence in other gun and drug cases.  And the District Attorney concluded that Turner's "conviction was obtained in violation of [his] constitutional right to Due Process under the 14th Amendment to the United States Constitution and the New York State Constitution."

5.      The wrongful conviction took a tremendous toll on Turner.  After serving his sentence, he struggled mightily to piece his life back together.  Institutionalized and lost, he fell back into jail in 2016.  This time, marked as a violent felon, he was treated harshly due to the prior wrongful conviction and served an enhanced sentence of three and a half to seven years in jail.  And he continues to suffer the consequences of the wrongful conviction.

6.      As a result of the police misconduct, the failure to train, supervise, and/or discipline officers, and/or the failure to prevent or correct a culture of falsifying and fabricating evidence, withholding exculpatory evidence, violating the right against unreasonable search and seizure, and lying to prosecutors, verbally and in written reports, and to courts, in court documents and in court proceedings, Turner was wrongfully charged, prosecuted, convicted, and sentenced; he was also wrongfully treated as a violent predicate in a subsequent case; he unfairly lost civil liberties and valuable rights; and he suffered emotionally and in other significant ways.

7.      This cause of action raises violations of Turner's rights to due process of law and to a fair prosecution and trial, as well as raising claims of malicious prosecution and illegal search and seizure; it also holds the individual defendants responsible for their wrongdoing, as well as the City of New York, under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978) ("*Monell*"); and it seeks monetary damages.

## JURISDICTION, VENUE, AND JURY DEMAND

8.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and Plaintiff's rights under Article I, §§ 6 and 12 of the Constitution of the State of New York.

9.    An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

10.    Venue is properly laid in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because substantial parts of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

11.    Plaintiff demands trial by jury.

## PARTIES

12.    Plaintiff is a resident of Bronx County and was at all times relevant to this action a resident of Queens County in the State of New York.

13.    Defendant the City of New York is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department that acts as its agent in the area of law enforcement and for which it is ultimately responsible.

14.    Defendant the City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

15.    Defendant Kevin Desormeau (Shield No. 631, Tax ID No. 941653) (hereinafter "Desormeau") was at all relevant times described herein an NYPD officer, employed by the City of New York.  At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of his duties.

16.     Defendant Police Officers John and/or Jane Does #1-10 (Shield Nos. and Tax ID Nos. Unknown) (hereinafter "Doe Defendants") were at all relevant times described herein NYPD officers, employed by the City of New York, and were acting under color of New York state law and acting in the course and scope of the duties attendant to that employment.

17.     Desormeau and the Doe Defendants are referred to as the "Individual Defendants."

18.     At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.  They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents, and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees, and agents of the NYPD.

19.     The Individual Defendants are being sued in their individual capacities.

20.     The Individual Defendants are entitled to indemnification by the City of New York under New York law for any liability arising from their conduct described herein.

21.     At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

22.     "Defendants" refers herein to the Individual Defendants, the City of New York, and the NYPD, which is an agency under the authority and control of the City of New York.

23.     Although the true names, shield numbers and tax ID numbers of Doe Defendants are not currently known to the Plaintiff, they were at the relevant times employees or agents of

the NYPD. Accordingly, they are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law§ 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiff intends to name said officers as defendants in an amended pleading once the true names and/or shield numbers and/or tax ID numbers are known and (b) that the Law Department should immediately begin preparing Defendants Does' defenses in this action.

### FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

24.     Turner was arrested on October 20, 2010, at approximately 9:30 pm near his home at 129-13 135 Place in Queens, New York. Desormeau was the arresting officer. Desormeau also swore out a criminal court complaint on October 21, 2010, initiating a prosecution against Turner for violating two counts of criminal possession of a firearm in the second degree under New York State Penal Law §§ 265.03(1) and (3).

25.     The criminal court complaint states, among other things, that during an encounter with Desormeau, Turner appeared as if he was hiding something in his pocket, ran away when a pat down was attempted, and then discarded a vest which contained a loaded .22 caliber semi-automatic pistol. However, this was false.

26.     Turner did not act suspiciously or in a manner that would justify the stop or pursuit, nor did he possess a gun. Rather, Turner was simply standing with his girlfriend close to his home and was aggressively approached by Desormeau for no apparent reason. Because of Desormeau's reputation of being a corrupt cop and because of how Turner was approached and the lack of reason for it, Turner tried to get away. Desormeau pursued Turner and apprehended him. Desormeau falsely claimed that Turner possessed a gun and attempted to use this false accusation as leverage against Turner's stepfather, whom Desormeau suspected of being

involved in drug offenses. He threatened Turner's stepfather that he would falsely charge Turner with possessing a firearm if Turner's stepfather did not cooperate. Turner's stepfather did not cooperate, and Desormeau made good on this threat.

27.     Desormeau and the other Doe Defendants lied to prosecutors about the encounter with Turner, saying that it gave rise to a stop, pursuit, and search, and falsely claiming that Turner possessed a gun when he did not. Desormeau and the Doe Defendants memorialized these lies in police reports.

28.     Relying on the falsehoods, prosecutors decided to continue the prosecution with the false understanding that Turner possessed a firearm and that the stop, pursuit, and alleged recovery of a gun were legal and could pass constitutional muster.

29.     Relying on the falsehoods, prosecutors sought bail against Turner, and at his criminal court arraignment on October 21, 2010, secured bail in the amount of a $25,000 bond or $15,000 in cash, which Turner could not afford. As a result, he was detained.

30.     Relying on the falsehoods, prosecutors obtained an indictment against Turner on December 13, 2010.

31.     Upon information and belief, Desormeau and/or the Doe Defendants testified in the grand jury, and in sum and substance repeated the falsehoods.

32.     The indictment, which was based on false information, effectively caused Turner to remain in jail during the pendency of the case in Supreme Court, Criminal Term.

33.     The falsehoods caused the prosecutor to oppose and the court to deny Turner's motion to inspect the grand jury minutes and dismiss the indictment.

34.     The falsehoods caused the prosecutor to file a false document in court and oppose Turner's motion to suppress physical evidence, namely a firearm.

6

35.     The truth would have also caused early termination of the prosecution because it would have been known that Turner did not in fact possess a gun.

36.     Had the Individual Defendants not lied about the encounter, Turner's motion to suppress would have been conceded or granted; and because the only charge was possession of a weapon, the case would have been dismissed.

37.     The falsehoods put pressure on Turner to consider a guilty plea.  At the time, the Queens County District Attorney's Office was demanding mandatory jail sentences for gun possession charges and was not offering plea bargains on indicted cases.

38.     The prosecution and the falsehoods upon which it was based caused Turner's attorney to misadvise Turner about the strength of the case and his chances of prevailing at a suppression hearing and/or trial.

39.     Unfairly influenced by the falsehoods, and despite his innocence and the viability of a motion to suppress, Turner decided to waive his right to a suppression hearing and trial and plead guilty.

40.     On April 4, 2012, Turner pled guilty to criminal possession of a weapon in the second degree and was promised a sentence of three and a half years in jail.  He was then remanded without the possibility of making bail.

41.     On June 14, 2012, Turner was sentenced by the court to three and a half years in jail.

42.     Before being released, Turner served approximately 20 months at Riker's Island and 18 months in state prison.

43.     Turner was only 17 years of age when he was wrongfully arrested on October 20, 2010.  He was just about to finish high school and enter adulthood and had great promise. Unfortunately, jail and prison dramatically altered his life trajectory.

44.     During the lengthy pretrial detention, he was housed with violent criminals and had to fend for himself.  He was abused by hostile correction officers.  He lost faith in the criminal justice system and in humanity.

45.     State prison was different but equally difficult.  There, he was farther from family, alienated, and out of touch.

46.     When Turner was finally released to parole in October 2013, he felt institutionalized. He lost confidence and lost his interest and desire to be the person he aspired to be before his incarceration – someone on the verge of graduating from high school and starting an adult life.

47.     Turner floundered on the outside and had trouble coping.  Labelled as a convicted felon, he had trouble being accepted and finding meaningful employment.  His relationships with family and friends also suffered.

48.     In 2016 he was arrested for attempted criminal possession of a weapon and pled guilty.  Because he had a prior felony conviction, he was sentenced to 3 ½  to 7 years in prison and served 4 years and 10 months of that sentence.

49.     This tragedy was caused by the Individual Defendants and the City of New York.

50.     Desormeau acted with impunity.  He was permitted to run wild in the NYPD and commit brazen violations of civil rights, undeterred and without fear of discipline.

51.     Finally, Desormeau came under scrutiny long after Turner's wrongful conviction. Desormeau lost his job with the NYPD and was criminally prosecuted.  But these consequences occurred only because irrefutable evidence of his misconduct, which could not be avoided, came to light.

52.     Desormeau and his partner Sasha Cordoba were captured on video fabricating evidence.

[Before his perjury conviction in 2018] Desormeau had a long history of troublesome behavior before his ultimate conviction and firing from the NYPD.

He was the subject of 43 Civilian Complaint Review Board allegations during his time with the NYPD, nine of which were substantiated.

Working out of the Queens South Gang Squad, Desormeau was accused of planting drugs and evidence, as well as taunting those who he arrested.

*** 

Cordoba and Desormeau were both working in Manhattan in November 2014, when they searched a woman's apartment and arrested a man for gun possession. The detectives later said that a witness had told them that a man in the apartment had pointed a gun at him and that the accused man answered the door with a gun when the police officers knocked.

The man was indicted before both Cordoba and Desormeau were charged and convicted for fabricating the whole story…. Cordoba…served two months in prison after she admitted that she had repeatedly lied about the gun search.

*Queens Judge Vacates 60 convictions*, Queens Daily Eagle, November 8, 2021.

53.     In 2021, Queens District Attorney Melinda Katz spearheaded the dismissal of 60 cases, half of which related to work by Desormeau.  She stated that "the majority of the cases vacated…, were primarily based on 'observed crimes, drugs transactions, searches and seizures of drugs, weapons and other contraband.'" *Id.*

54.     "Desormeau, who served as the main witness in 34 of the 60 cases vacated this week, was convicted of perjury after he and his partner, Cordoba, repeatedly lied to prosecutors and the court about a 2014 gun bust." *Id.*

55.     In Court papers seeking Turner's exoneration, the Queens County District Attorney stated that his "conviction is irrevocably tainted… Detective Kevin Desormeau was convicted in both Queens and Manhattan on charges related to police misconduct [including]… Perjury… when it was revealed that he lied about witnessing a drug sale that videotaped

evidence showed did not take place [and]… Offering a False Instrument to File… when it was revealed that he fabricated the facts of an arrest of a man for gun possession…."

56.     The DA's motion to vacate Turner's conviction noted that "Detective Desormeau was an essential witness in the arrest and prosecution of the defendant.  Because of Detective Desormoeau's criminal conduct, defendant's conviction was obtained in violation of the defendant's constitutional right to Due Process under the 14th Amendment to the United States Constitution and the New York State Constitution Article I, Section 6."

57.     On November 8, 2021, the Honorable Michelle Johnson, a justice of the Supreme Court in Queens County, granted the joint application of the DA and Turner, and dismissed the case.

58.     Today, even though exonerated of the wrongful conviction, Turner is not who he was or what he could have been.

### FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution**
**(Against Individual Defendants)**

59.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

60.     The Individual Defendants, individually and/or in concert, initiated the criminal prosecution and/or continued criminal proceedings against Plaintiff.

61.     The prosecution and/or proceedings were lacking in probable cause.

62.     The Individual Defendants acted knowingly, willfully, intentionally, and with actual malice to deprive Plaintiff of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

63.     The criminal proceedings terminated in Plaintiff's favor.

10

64.     The Individual Defendants are liable for violations of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 Claims for Violations of the Right to a Fair Trial and to Due Process of Law under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution (Against Individual Defendants)**

65.     Plaintiff hereby incorporates and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein and further alleges as follows.

66.     On or about October 20, 2010, and thereafter, the Individual Defendants, individually and/or in concert, created a false account about a police encounter with Turner and fabricated evidence against him.

67.     On or about October 20, 2010, and thereafter, the Individual Defendants, who were police officers at the time of their actions, individually and/or in concert, knowingly forwarded the false account and fabricated evidence (verbally and/or in written reports) to prosecutors in the Queens County District Attorney's Office.

68.     The Individual Defendants had an obligation to provide truthful information to prosecutors and Plaintiff about their investigation and to not omit material information and evidence.

69.     By forwarding the false information to prosecutors, the Individual Defendants, individually and/or in concert, undermined prosecutors' decision-making about the efficacy of the case and caused them to unfairly prosecute and convict Plaintiff.

70.     The forwarding of the false information and the omission of the truth to prosecutors by the Individual Defendants was likely to influence a jury's decision and/or undermine confidence in the outcome of the trial.

11

71.     The forwarding of the false information and the omission of the truth to prosecutors by the Individual Defendants violated Turner's right to a fair prosecution, and/or fair trials, and/or fair sentencings.

72.     The Individual Defendants, individually and/or in concert, concealed exculpatory evidence to prosecutors, namely that they planted a gun on Plaintiff and lacked a legally justifiable basis to stop, pursue, and search Plaintiff.

73.     The Individual Defendants' actions of concealing exculpatory evidence caused prosecutors to conceal exculpatory evidence to Plaintiff and thus undermined his right to effectively defend himself against the criminal charges and make informed decisions about how to proceed on the case.

74.     The Individual Defendants failed to timely disclose material favorable to prosecutors and the defense ("*Brady*" and *"Brady* material"), and the withholding contravened *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

75.     The Individual Defendants acted individually and in concert and conspiracy, deliberately and recklessly.

76.     No reasonable police officer in 2010 or thereafter would have believed that the actions of the Individual Defendants were lawful.

77.     As a direct and proximate cause of the actions and inactions of the Individual Defendants, Plaintiff was wrongfully charged, prosecuted, convicted, and sentenced (deprived of liberty) in violation of his clearly established constitutional rights to a fair trial and due process of law under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

78.     Consequently, the Individual Defendants are liable for violations of Plaintiff's

constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Violations of the Right Against Unreasonable Search
and Seizure under the Fourth Amendment and Violations of Due Process of Law under the
Fifth and Fourteenth Amendments of the U.S. Constitution
(Against Individual Defendants)**

79.     Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein, and further alleges as follows.

80.     The Individual Defendants searched Plaintiff without probable cause to do so.

81.     Even if there was probable cause, the manner in which the search was conducted

was unreasonable.

82.     By virtue of the aforementioned acts by the Individual Defendants, Plaintiff was

deprived of his civil rights guaranteed under the Fourth Amendment to the United States

Constitution to be free from unreasonable or unlawful searches and seizures, and the Individual

Defendants therefore are liable to Plaintiff for damages under 42 U.S.C. § 1983.

83.     Turner was concomitantly denied his right to Due Process of Law under the Fifth

and Fourteenth Amendments to the United States Constitution, and the Individual Defendants

therefore are liable to Plaintiff for damages under 42 U.S.C. § 1983.

84.     Consequently, the Individual Defendants are liable for violations of Plaintiff's

constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**Failure to Intervene and Conspiracy Under 42 U.S.C. § 1983
(Against the Individual Defendants)**

85.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in

the above paragraphs with the same force and effect as if fully set forth herein.

13

86.     The Individual Defendants failed to intervene to prevent, end, or report the unlawful and unconstitutional conduct to which Plaintiff was subjected despite the fact that they had opportunities to do so.

87.     The Individual Defendants thereby displayed deliberate indifference to Plaintiff's rights, including Plaintiff's right to be free from malicious prosecution, unfair prosecution, trial, and sentencing, the right to obtain timely *Brady* material, and the right against unreasonable and unlawful searches and seizures.

88.     The Individual Defendants agreed among themselves and with other individuals to act in concert and thus conspired to deprive Plaintiff of clearly established civil rights.

89.     The Individual Defendants deprived Plaintiff of civil rights guaranteed under the Constitution of the United States.

90.     As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

91.     As a result of the above unconstitutional conduct, the Individual Defendants are liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### FIFTH CAUSE OF ACTION

**Violations of the New York State Constitution**
**(Against All Defendants)**

92.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

93.     By virtue of the aforementioned acts, the Defendant Detectives are liable to Plaintiff for violating his right to due process under Article I, § 6 of the New York State Constitution, and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

14

94.     Defendant City of New York is liable for these violations of the New York State Constitution under the principle of *respondeat superior*.

95.     Consequently, the Defendants are liable to Plaintiff for compensatory and punitive damages.

### SIXTH CAUSE OF ACTION

### *Monell* Municipal Liability under 42 U.S.C. § 1983
### (Against the CITY OF NEW YORK)

96.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

97.     What the Individual Defendants did to Plaintiff was not isolated.

98.     The City of New York is liable for the conduct of the Individual Defendants under *Monell v. Dept. of Soc. Svcs.* because the driving force behind the constitutional violations were the *de facto* and explicit policies and practices of the NYPD and the City of New York.

99.     The City of New York consistently fails to properly train, supervise, and discipline their officers for flagrant civil and constitutional violations.  Indeed, instead of disciplining wrongdoers, NYPD and policymakers for the City of New York promote them, thus encouraging them to commit and continue to commit misconduct and constitutional violations.

100.    At the time of Plaintiff's arrest and prosecution, the City of New York, acting through policymaking officials for the NYPD, acted with deliberate indifference to the constitutional rights of individuals by accepting plainly inadequate policies, practices, procedures, and customs, through a failure to train and supervise officers concerning their constitutional duty to not fabricate evidence, to truthfully report and document police encounters, to disclose *Brady* material to prosecutors and the accused, and to not engage in unreasonable and

15

unlawful searches and seizures; and through failing to discipline officers when they violate the above described constitutional duties.

101.    Supervisory personnel and policymakers in the NYPD were aware of this widespread problem but took no effective corrective or preventive measures.  Rather, NYPD officers witnessing abuses of their fellow officers, and supervisors and department policymakers knowing about them, purposely turned a blind eye and even covered up the abuses.  Thus, police officers like the Individual Defendants were left to operate with the sense that they could fabricate evidence, lie about their work, withhold *Brady* material, and commit unreasonable and unlawful searches and seizures without risk of disciplinary consequences.

102.    On July 7, 1994 – over a decade before Plaintiff's arrest—a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") found that:

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. . . .

> Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means,  officers  take the  law  into  their  own  hands.  And  police falsification is the result.

 Mollen Report at 38.

103.    The Mollen Report noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." Mollen Report at 36.  It referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police

falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful… This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, 'What's wrong with that? They're guilty.'" *Id.* at 41.

> 104. The Commission noted that:
> the Department's top commanders must share the blame…. We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics*.

*Id.* at 41-42 (emphasis added).

105. "Several officers… told [the Commission] that the practice of police falsification… is so common in certain precincts that it has spawned its own word 'testilying." *Id.* at 36.

106. The warnings expressed by the Mollen Commission were virtually ignored, with police perjury persisting, and wrongful prosecutions and convictions occurring, after Plaintiff's arrest and prosecution. *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times (Mar. 18, 2018), https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

107. There are too many examples of police fabricating evidence and NYPD's acquiescence to such misconduct to list. A few examples, however, illustrate the tolerance by NYPD policymakers and even encouragement of the misconduct. Aware of the red flags, NYPD has a practice of promoting its wrongdoers, when firing, demoting, or disciplining them is the

obvious and sensible response. Advancement in the Department not only sends the message to rank and file officers that their misconduct will be rewarded, but it also tells them that their superiors, who are known to have committed misconduct themselves, will protect them.

108.    Two other detectives whose recurrent misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and his frequent partner Stephen Chmil at Brooklyn Homicide.

109.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant." The decision detailed how Scarcella employed improper and unconstitutional practices:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

110.    Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no investigation of and took no disciplinary action against Scarcella. Instead, he was given free rein to continue to wreak havoc.

111.    Two years later in 1990, David Ranta was arrested and framed for murder by Scarcella. Again, Justice Egitto was on to him and made it known. Scarcella claimed that a witness, who was incarcerated and facing lengthy prison time, told him that two people with the names of David and Steve committed the murder. At the suppression hearing, Justice Egitto said:

I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.

It stretches the credibility of the court in how these pictures are obtained.

112.    The court stated how "disillusioned" it was "with the work of the detectives" and surmised that Scarcella and Chmil influenced a young teenage witness to identify Ranta in a lineup.

113.    The court added:

I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package. . . [T]hey decide the case and that is the reason why *a lot of our cases are being blown out* when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. *The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution.* And they have to live up to it. . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner. . .

I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair. [emphasis added]

114.    Sure enough, years later the eyewitness admitted that he was told to pick the person with the "big nose," who was David Ranta, and Ranta was exonerated.  But not until after the damage was done.  Ranta served 23 years in prison before his exoneration in 2013.

115.    NYPD ignored clear warning signs communicated in the clearest of terms by a Justice of the Supreme Court and failed to take any action again Scarcella and Chmil, let alone discipline them.  Shortly after Justice Egitto's criticisms in *Ranta*, another debacle of justice occurred at the hands of Scarcella, which could have been avoided had the NYPD cared.

116.    In 1991, one year after Ranta was arrested, Scarcella framed two teenagers, John Bunn and Roseanne Hargrove, for shooting two correction officers, one of whom died from his injuries.  Bunn, who was only 14 years old, and Hargrove, 17, looked nothing like the described perpetrators.  After a CPL § 440 hearing in *Hargrove*, that resulted in a vacatur of the conviction, the court found Scarcella's testimony to be "false, misleading, and non-cooperative," and the court, as well as the appellate court that upheld the vacatur, discredited Scarcella's and Chmil's account of how the identification, the only evidence, came to be. *People v. Hargrove,* 48 Misc. 1208(A) *6 (NY Sup. Ct. Kings Cty. 2015); *People v. Hargrove,* 162 A.D.3d 25, 62-65 (2d Dept. 2018).

117.    In vacating Bunn's conviction, the 440-court found that he was illegally arrested in this home without a warrant and taken to the police station under the false pretense that he was wanted for a robbery.  He was then placed in line-up for the murder, apparently for no reason other than that he was acquainted with Hargrove from the neighborhood.  Again, the court found Scarcella's testimony at the hearing to be incredible, including his contention that he was not assigned to the case, which he later admitted was false, and his claim that he was not involved in the line-up identification, despite documentation and testimony to the contrary.

118.    A series of other cases involving Scarcella and Chmil around the time of Bunn and Hargrove were later dismissed due to their blatant misconduct – Derrick Hamilton, Robert Hill, Alvena Jenette, Darryl Austin, Roger Logan, Shabaka Shakur, Carlos Davis, Vanessa Gathers, Jabbar Collins, Sundhe Moses, Shawn Williams.[1]  All were avoidable if the NYPD and policymakers of the City of New York had not ignored the red flags and had acted.

---

[1] In six of the cases, Scarcella used a go-to informant and drug addict, Teresa Gomez, who allegedly witnessed six different homicides.

20

119.    Michael Codella was another corrupt officer.  He started his career with the New York City Housing Authority Police Department ("HAPD") and collaborated with NYPD, investigating drug crimes.  He then became an NYPD officer.  He boasted in his book "Alphaville," St. Martin's Press (2010), Codella, that while assigned to Manhattan's Lower East Side in the late 1980s and through the mid-1990s, he would illegally search and beat up suspects, plant evidence on them, coerce false confessions, take money from them, and brazenly lie about it to judges, prosecutors, defense lawyers, and Internal Affairs investigators.

120.    Codella admitted that he would force drug dealers and junkies to manufacture false robbery complaints when the Police Department wanted to increase robbery arrests.  He recounted how he beat and coerced a suspect to confess, and how he framed a low-level drug dealer with murder because he would not cooperate.

121.    Codella wrote in his book:
I'd rewritten the *Patrol Guide* in order to suit my own needs. I'd lied to bosses, friends, and district attorneys, told IAB [Internal Affairs Bureau] to go fuck themselves, and taught people I worked with to do the same.  I'd committed my own crimes to ensure that arrests were made and bad guys went to jail.

122.    Codella acknowledged being the subject of nearly two dozen Internal Affairs and other misconduct complaints.

123.    Notwithstanding their awareness of the high number of serious complaints made against him, the HAPD, and later the NYPD, continually promoted Codella, allowed him to train and supervise other officers, and recommended him for assignment to a Joint State-Federal Narcotics Task Force.[2]

---

[2] Like Codella, Desmoreau had an excessive number of complaints against him that were disregarded by NYPD.

124.    Ultimately, Codella became a detective-sergeant with the NYPD in charge of other officers before he retired in 2003.

125.    Michael Race was another homicide detective who investigated 750 murders in the late 1980s and early 1990s.  He admitted that only one was "done the correct way, from A to Z."  A NYPD colleague, who testified in a civil rights case, said that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).  Blake, a victim of Race's misconduct, was exonerated in 1998, when an eyewitness, cultivated by Race, was found to be unreliable.

126.    Between 1994 and 1996, numerous senior detectives and supervisors from NYPD's Internal Affairs Bureau ("IAB") – NYPD's purported watchdog – conspired to frame Zaher Zahrey, an undercover narcotics detective, for drug-related crimes and murder.  The plot involved enticing a state prisoner to tell a false story about Zharey.  When it was revealed, Zahrey was acquitted after spending nine months in jail, and related NYPD administrative charges were dismissed.

127.    Despite the jury determination and the finding by the administrative judge (ratified by the Police Commissioner) that one of the IAB officers, Sgt. Robert Boyce, manufactured the false allegations, Boyce continued to be promoted and made it as far as Chief of Detectives for the entire Department.

128.    Other examples of unchecked and tolerated falsifications of evidence are:  Queens detective John Gillen who improperly influenced a witness to identify Kareem Bellamy in 1994

22

and engaged in similar conduct in another case against Emmett Wheaton in 1996; NYPD

Detective Jose Rosario who manipulated a witness to falsely identify Ronald Ambrose in a

Manhattan case; and NYPD detectives and Queens prosecutors who used improper identification

procedures to cause the wrongful conviction of Julio Negron in 2005, and of Ricardo Benitez in

2009.  The list goes on.[3]

129.    NYPD and New York City policymakers also caused the Individual Defendants to

cover up the misconduct and withhold the true exculpatory facts from prosecutors and Plaintiff in

contravention of *Brady* and the Fifth and Fourteenth Amendments of the U.S. Constitution.

130.    Depositions of NYPD officers in civil rights cases before and after Turner's arrest

demonstrate an utter lack of understanding of their obligations to provide exculpatory materials

under *Brady. See, e.g.*, Deposition of Homicide Det. Vincent Gerecitano, *Collins v. City of New*

*York,* 11-cv-766 (FB) (E.D.N.Y.)**,** at p. 43 ("The *Brady* Rule, I don't know what that is.");

Deposition of Det. Jose R. Hernandez, *Collins, supra,* at pp. 33-34, 36 ("never heard of" *Brady*);

Deposition of former Capt. Robert Boyce, *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP)

(S.D.N.Y.), at pp. 20-22, 35-36 (never heard of "*Brady v. Maryland*," received no training

concerning documenting or disclosing to defense counsel exculpatory or impeachment

evidence.); Deposition of Det.-Sgt. Michael McWilliams, *Zahrey, supra,* at pp. 28-29, 35-36, 37-

38 ("I don't know what *Brady v. Maryland* is" and received no *Brady* training); Deposition of

Det. Daniel Toohey, *Poventud v. City of New York,* 07-cv-3988 (DAB) (S.D.N.Y.), at pp. 145-46

(does not know what "*Brady* material" is).

---

[3] The National Registry of Exonerations charts exonerations in the United States from 1989 to present. https://www.law.umich.edu/special/exoneration/Pages/mission.aspx.  It has identified 226 exonerations in New York City during that period. 106 of the exonerations (nearly half) involved police misconduct.

131.    Shortly before Plaintiff's arrest and prosecution, The New York State Bar Association's Task Force on Wrongful Convictions released a report. *Final Report of the New York State Bar Association's Task Force on Wrongful Convictions*, April 4, 2009, "NYSBA Report."  It found that "government practices" – which included NYPD's failure to comply with *Brady* obligations – were a "substantial contributor to wrongful convictions" *Id.* at 19.

132.    The Task Force found that police failed to make reports of "information that was viewed by the detective as not aiding the investigation." *Id.* at 44.  The Task Force observed that "[p]rosecutors' access to evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38. And one of the recommendations by the Task Force as to police was the need for "Train[ing] and Supervis[ion] in the Application of *Brady* and Truthful Evidence Rules." *Id.* at 37.

133.    A pattern and practice of police misconduct in the NYPD also extends to systemic violations of the right against unreasonable and unlawful searches and seizures under the Fourth Amendment to the U.S. Constitution.

134.    Based on data published by Pro Publica covering CCRB investigations from September 1985 to January 2020, the CCRB substantiated misconduct findings against 1,374 NYPD officers who engaged in illegal searches, *i.e.* Fourth Amendment violations.  These officers not only kept their jobs—half of them were given promotions:

     i.    2 Inspectors engaged in illegal searches, one later became a chief and the other a deputy chief (100%);

     ii.    4 Deputy Inspectors engaged in illegal searches, all 4 were later promoted (100%);

     iii.    10 Captains engaged in illegal searches, and 4 were later promoted (40%);

     iv.    46 Lieutenants engaged in illegal searches, and 23 were alter promoted (50%);

     v.    152 Detectives engaged in illegal searches, 48 were later promoted (32%);

vi.    226 Sergeants engaged in illegal searches, 111 were promoted (49%);

vii.    794 police officers engaged in illegal searches, 359 were later promoted (45%).

135.    Of the 359 police officers known to have violated the Fourth Amendment, the vast majority, 291, were promoted to detective—a promotion supposedly based entirely on merit.

136.    These substantiated complaints represent the most extreme police misconduct, because CCRB only substantiates complaints when the misconduct is virtually undeniable.  Therefore, the 1,374 instances of misconduct listed above do not represent all of the allegations of illegal searches which were investigated; rather, they represent only the most severe instances of misconduct, which were proven by substantial evidence.

137.    In 2019, Eastern District of New York Judge Raymond J. Dearie reviewed multiple unsubstantiated CCRB closing reports and found that:

> (1) Investigators systematically refuse to credit testimony by civilian witnesses with regards to use of force yet routinely credit uncorroborated statements by the officers. Investigators decline to substantiate allegations, even when they find them to be plausible, whenever the officers deny the offending conduct. … (2) In one- on-one confrontations between an officer and an individual, the standoff is always resolved in favor of the officer. … (3) Investigators reach conclusions that defy common sense and do not logically flow from the investigation's factual record. … (4) The depth of investigation conducted does not match the gravity of the allegations. … [and] (5) Investigators do not consider the officer's complaint history to identify patterns in the officer's behavior.

*Jenkins v. City of New York*, 388 F. Supp. 3d 179, 188-91 (E.D.N.Y. 2019).

138.    On November 15, 2020, the New York Times reported that out of 6,900 of the misconduct charges recommended for sanctions by the CCRB, the NYPD leadership reduced the recommended penalty in 71 percent of the cases.  By far the most common penalty actually imposed is loss of a few vacation days.

139.    No matter what the misconduct, NYPD officers almost never lose their jobs. There are approximately 36,000 NYPD officers.  The CCRB has investigated more than 48,000 officers over the last several decades, according to data released last year.  As of 2020, only nine officers have been terminated following a finding of misconduct.

140.    Even in particularly egregious cases, the NYPD refuses to effectively discipline officers.

141.    For example, David "Bullethead" Grieco has been the subject of almost three dozen lawsuits and numerous incidents of misconduct, almost all violations of the Fourth Amendment.  In one 2020 case, the litigants allege that Grieco and a group of officers "forcefully entered" the Plaintiffs' apartments without consent, arrested its occupants— including a paraplegic man who was subjected to excessive force—and unlawfully searched each apartment in the home.[4]  On a separate occasion, Grieco burst into a home without a warrant and detained six-year-old twins, who he then transported to the precinct.[5]

142.    Nonetheless, Grieco was promoted to sergeant in 2018 after making over $190,000 in fiscal year 2017.  The City has paid over $600,000 in settlements arising from Grieco's unlawful tactics, yet the NYPD continues to allow Grieco to remain on the force with almost no oversight or discipline.

143.    These patterns of unlawful searches and seizures are present at every level of the NYPD command, demonstrating that (1) the culture and policies of the NYPD have long

---

[4] *See* Complaint in *Laroc at al v. City of New York,* Case No. 20-cv-5227 (E.D.N.Y.) at ECF Doc No. 1.

[5] *See* Offenhartz, Jake, "Here Are NYC's Most Sued Cops Who Are Still On The Job, According To New Public Database," Gothamist (Mar. 7, 2019), available at https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database.

failed to protect the Fourth Amendment rights of New Yorkers; and (2) officers who have substantiated complaints regarding violations of the Fourth Amendment have no trouble climbing to the highest ranks of the department, further perpetuating these unconstitutional practices.

144.     For example, while holding the rank of Commanding Officer of the 44th Precinct, then-Inspector Brian Mullen unlawfully ordered the false arrest of an adult male and his fifteen- year-old minor son inside a hospital where they were visiting an ailing family member.   The minor son was the victim of an attempted robbery in the waiting area of the hospital, which triggered the police response.   Rather than investigate the crime committed against the teen, Mullen and his officers employed excessive force and arrested the boy and his father.   This Fourth Amendment violation was eventually substantiated by the CCRB, who recommended disciplinary action.  The NYPD declined to discipline Mullen at all.

145.     Chief-of-Crime Control Strategies Michael Lipetri's multiple CCRB complaints include a substantiated complaint from 2015 in which Lipetri, an Inspector at the time, and four other officers barged into a man's home unannounced at 5:00 a.m. where the man and his family members, including two children, were sleeping.  Not only was the entry itself unlawful, but the officers also broke into the wrong home.  No one bearing the name on the arrest warrant lived in or was present in the apartment.  Although CCRB recommended "formalized training," Lipetri only received "instructions" for the violation, the most lenient response.[6]

---

[6] Smith, Greg B., "Misconduct Complaints Trailed NYPD Commissioner Shea and Other Police Brass' Rise to the Top," The City (Mar. 22, 2021), available at https://www.thecity.nyc/2021/3/22/22345475/nypd-misconduct-complaints-trailed-shea-police-brass.

146.    Before Chief of Department Rodney Harrison was promoted, he was a sergeant at the 83rd Precinct in Brooklyn when he and a group of officers illegally entered the apartment of a mother and her five children with their weapons drawn, claiming that they were searching for the children's father. The CCRB recommended departmental charges, but the NYPD imposed command discipline—which almost always amounts to only a loss of vacation days.[7]

147.    Even NYPD Police Commissioner Dermont F. Shea has at least one substantiated CCRB complaint for violations of the Fourth Amendment on his record, which included an illegal vehicle stop, illegal search of persons, and illegal search of a car.  When the CCRB recommended charges, the NYPD instead ordered that Shea and the other involved officer undergo departmental "instructions."[8]

148.    Because of practices and *de facto* policies maintained by the City of New York, the Individual Defendants had every reason to believe they would not receive any meaningful punishment for gross misconduct and lying about it, nor did they have reason to believe that gross misconduct in the course of their duties would in any way impair their chances of being promoted or continuing on to a lengthy and decorated career in the department.

149.    One thing is clear:  the City of New York abdicated its responsibility to the public by turning a blind eye to police officers fabricating evidence, wrongfully convicting people, withholding *Brady* material, engaging in unreasonable and unlawful searches and seizures, and lying.  Indeed, it encouraged this behavior by failing to train and supervise officers, and by

---

[7] *Id.*

[8] *Id.*

failing to discipline wrongdoers.  In fact, it promoted miscreants, put them in supervisory positions, and created a culture in the NYPD where wrongdoing and coverups are acceptable customs and practices.

150.    As a result of these unconstitutional policies and practices, Plaintiffs were deprived of their constitutional rights, and the City of New York is liable under *Monell* for damages caused by the Individual Defendants.

## DAMAGES

151.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and further alleges as follows.

152.    As a direct and proximate cause of Defendants' actions and inactions, Plaintiff was deprived of his civil rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

153.    This action seeks damages from October 20, 2010 through the present.

154.    Defendants' acts and omissions caused injuries and damages to Plaintiff which were foreseeable to Defendants at the time of the acts and omissions and which continue to date and will continue into the future, and include but are not limited to:  loss of liberty, physical injuries, pain and suffering, mental anguish, emotional distress, psychological damage, loss of relationships, loss of family, loss of companionship, loss of consortium, loss of guidance, loss of emotional and psychological development, loss of maturing in a natural environment, loss of educational opportunity, loss of vocational training, loss of professional opportunity, loss of income, susceptibility to illness and illness, inadequate medical care, humiliation, embarrassment, degradation, and restrictions on diet, sleep, personal contact, athletics, personal growth and fulfillment, sexual activity, enjoyment, and free expression.

155.     Such acts and omissions of Defendants entitle Plaintiff to compensatory and punitive damages.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

        a.        Compensatory damages;

        b.        Punitive damages;

        c.        The convening and empaneling of a jury to consider the merits of the claims herein;

        d.        Costs and interest and attorney's fees;

        e.        Such other and further relief as this court may deem appropriate and equitable.

Dated:  New York, New York
        February 22, 2023

        **GLENN A. GARBER, P.C.**

By: _____
        Glenn A. Garber

        The Woolworth Building
        233 Broadway Suite 2370
        New York, New York 10279
        (212) 965-9370
        *Attorneys for Plaintiff Erick Turner*

## ATTORNEY'S VERIFICATION

I, Glenn A. Garber, an attorney duly admitted to practice before the Courts of the State of New York, affirm the following to be true under the penalties of perjury:

1) I am the attorney of record for the Plaintiff.

2) I have read the annexed Verified Complaint and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true.  My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, and other pertinent information contained in my files.

3) This verification is made by me because Plaintiff does not reside in the County where I maintain my offices.

Dated: New York, New York
        February 22, 2023

**GLENN A. GARBER, P.C.**

By: _____
        Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
(212) 965-9370
*Attorneys for Plaintiff Erick Turner*

31